## UNITED STATES v. WILSON et al.

### (District Court, D. Oregon. July 31, 1895.)

### No. 3,594.

1. JURY—PREJUDICE—EVIDENCE.

For the purpose of impeaching the verdict of a jury in a criminal case, the defendant, upon a motion for a new trial, offered the affidavit of one S. to the effect that one of the jurors, before being taken upon the jury, had said to S. that he would like to get on the jury, and to "cinch" the defendant. This statement was contradicted by the juror, and no explanation was offered of the failure of S.—who was deeply interested in the defendant's behalf, and was present at the trial—to disclose the circumstance until after the trial. Held, that the affidavit was insufficient to impeach the verdict.

2. NEW TRIAL—DOCUMENTS IMPROPERLY IN POSSESSION OF THE JURY.

Upon the trial of several defendants for conspiracy, some 50 letters were admitted in evidence provisionally, subject to further proof. Though no further proof was offered, the letters were taken to the jury room, and remained in the possession of the jury two hours; until they were sent for

by the judge and removed. During this time the jury were reading and discussing the letters. Only three of the letters contained statements claimed to be prejudicial to the defendants, and these, under the instructions given by the court relative to other letters in evidence, could not have been regarded by the jury as evidence against the defendants on the only litigated issue. *Held,* that the jury's possession of the letters was no ground for a new trial.

3. SAME—STATEMENTS AS TO PENALTY FOR CRIME.

In reply to an inquiry by the jury, the court, with the consent of the defendants' attorney, informed them of the penalty for the crime with which the defendants were charged. The attorney for the United States then stated that it was within the power of the court to impose a nominal penalty, to which the court added that the jury were not, therefore, to infer that if the defendants were found guilty the court would impose such a penalty. *Held,* that these proceedings afforded no ground for a new trial.

This was an indictment against John Wilson, James Lotan, and Seid Back for a violation of Rev. St. § 5440. After a verdict of guilty, the defendants moved for a new trial.

Daniel R. Murphy, U. S. Atty., John M. Gearin, Special Counsel, and Charles J. Schnabel, Asst. U. S. Atty., for the United States.

C. W. Fulton, Raleigh Stott, W. W. Thayer, Rufus Mallory, and George C. Stout, for defendants.

BELLINGER, District Judge. The defendants James Lotan and Seid Back move for a new trial on the following grounds: That the evidence is not sufficient to justify the verdict; that the verdict is against law; misconduct of the jury; errors of law occurring at the trial.

The defendants submit the affidavit of Garibaldi Stahr, who swears to statements made to him, while the jury was being impaneled by S. A. Hart, to the effect that he (Hart) would like to get into the jury box; that he would like to cinch that Chinaman,—meaning the defendant Seid Back. Hart was, shortly after the alleged statements were made, taken upon the jury, after having sworn in his examination touching his qualifications to serve on the jury, that he had not talked with any one about the case, and had no prejudice against the Chinese defendant, or his race. These statements attributed to Hart by Stahr are contradicted by the affidavit of the juror himself. Stahr says that the statement of Hart was in answer to his own statement that he would "like to get in that jury box," and this was assumed by defendants' attorneys, in the argument of the motion, to mean that Stahr was a friend of Seid Back, and desired to get on the jury so as to acquit him of the crime for which he was being tried. If such an affidavit could, under any circumstances, be allowed to impeach a juror, still this affiant is not, in my judgment, entitled to belief. There is no attempt to explain why Stahr should not have made the disclosure contained in his affidavit until after a verdict was returned against the defendant. Hart was sworn on the jury on May 21st. Stahr did not inform any one of Hart's alleged statements to him until the date of his affidavit, May 28th, although he was deeply interested in behalf of Seid Back, and was in attendance at the court room in the

hope that he might have an opportunity to serve him. The attorneys for this motion confess themselves unable to explain Stahr's silence during the trial. It is incredible that having this important fact to communicate, and being deeply interested in the welfare of Seid Back, he should have kept silent for a period of one week, and until after the verdict was rendered.

The fact principally relied upon in support of the motion grows out of the possession by the jury for a time of what are known as the "Dunbar Letters." There are between 50 and 60 letters written by Blum and Dunbar to Maj. John Wilson, at Victoria, and relating, so it is claimed, to the conspiracy charged in the indictment. The admission of these letters in evidence was objected to by the defendants on the ground that they were not proven so as to entitle them to be read in evidence. The court was of this opinion, and, in the state of the proof as to this, admitted the letters "provisionally,"—subject to further proof, or to such further examination as to the proof already made as should relieve the existing doubt as to their admissibility. No further proof was offered, nor was anything further said, concerning these letters, until the attorney for the government, in the closing argument to the jury, undertook to discuss them. On objection being made, the court refused to permit him to discuss the letters, because they had not been referred to by the attorneys for the defendants in their argument to the jury, and because of the state of the proof concerning them. Some two hours after the jury had retired to deliberate on their verdict, the judge of the court, remembering these letters, asked one of the attorneys for the government if they had been taken to the jury room; and, upon receiving an affirmative answer, he at once sent a bailiff to the jury room, with instructions to bring the letters away, which was done. The affidavits of some of the jurors accompany this motion. As to these letters, they show that, "during most of the" two hours during which they were in possession of the letters, "different jurors were reading and discussing" their contents. Only three of the letters are claimed to be prejudicial to the defendants. These three letters refer to the amount of money necessary to be charged and collected at Victoria to secure passage to Portland, and the landing here, of Chinese laborers. In one of them the writer says:

"Now be very careful what you do. First, we want to pay the banks and I cannot work here on less than $60 50 for L and 10 for certificates and fare on str. down."

The second of these three letters contains the following:

"Now be very careful. I require $50 each to get them through. 10 fare to the boat so you can pay the other 40 to the bank. That only means 100 to clean them up. Suppose you get 10 each trip, we can do all in three months. You must remember I have to put up the money here before they get off so you will have to collect and remit before the steamer arrives here."

The third letter repeats the statement in the above quotation as to the necessity the writer is under to "put up here [in Portland] before they get ashore."

Three of the jurors make affidavits in defendants' behalf, in impeachment of their own verdict. Two of these affidavits state the

opinions of the affiants that certain other matters particularly stated were prejudicial to the defendants. The disposition of these jurors, as shown by these affidavits, makes it reasonably certain that if either of these three letters was read or discussed, to their knowledge, by any one or more of the jury, or if they believed any of the jurors had read these particular letters, they would have stated the fact in the affidavits made by them. There is no inference that, out of some 50 or 55 letters, these 3 were read. To authorize an inference that the jury were influenced by matters not proper for their consideration, and prejudicial to the defendants, the fact that such matters came to their knowledge should be shown. There can be no inference upon an inference,—no inference that the jury were influenced from an inference that they saw the 3 particular letters out of the interdicted batch of 55. But, if the jury did see these letters, they could not have considered them as tending to connect these defendants with the crime charged, under the very explicit instructions of the court as to other letters properly in the case,—known as the "Mulkey Letters." As to these letters, the court instructed the jury as follows:

"You may consider the letters known in this case as the 'Mulkey Letters.' These letters do not depend for their proof of authenticity wholly upon the testimony of Blum. There is the testimony of witnesses, not accomplices, tending to prove that these letters are in Mulkey's handwriting, but as to this there is a conflict in the testimony. If these letters were written by Mulkey, they tend to establish the conspiracy, and to connect Mulkey with it; but any references you may find in these letters and in the Dunbar letters to other defendants, not connected with such letters, if you should find such references, are not competent evidence tending to connect the persons so referred to with such conspiracy. The connection of such other persons must be otherwise shown."

This subject was further adverted to by the court at the conclusion of the charge, when the following proceedings were had:

"Mr. Fulton (for the defense): We do not want any other exceptions than those that were taken at that time, and marked, I think. With this addition, I think probably your honor did not intend to state it as you did, or possibly I misunderstood you. You stated that acts or declarations of a coconspirator was not sufficient of itself,—I don't know whether you used the word 'itself,' or not,—was not sufficient to connect other parties with the conspiracy. The Court: I did not wish to qualify my statement to the jury by the word 'itself.' I say that the acts and statements of one conspirator do not tend in any degree to prove the connection of another person charged with the conspiracy; that such connection must be established by independent evidence, not by the acts in pursuance of the conspiracy of the conspirators themselves from whom the acts proceed; and I illustrated that by saying that, for instance, the references in the Mulkey letters to other defendants are not to be taken as proving the connection of the other defendants with the conspiracy, but are merely to be taken—those letters are—as proving the existency of a conspiracy, and Mulkey's connection with it, and Blum's. Mr. Fulton: That was what I desired."

Under these instructions, the jury could only consider these letters as tending to prove the existence of a conspiracy between Blum, Dunbar, and Wilson; and, if the plea of not guilty had the effect to put this in issue, it was, at most, but a technical denial of the existence of a conspiracy as charged between these three persons. There was no attempt to deny the existence of a conspiracy on the

trial. The attorney who opened the case for the defense admitted the existence of a conspiracy that at least included Jackling and Blum, and he stated that they might have been assisted by Dunbar. Another of the attorneys for the defense, in his concluding argument to the jury, said:

"Now, I am willing to concede that Jackling and Blum and Sig Baer were in the conspiracy. I haven't any doubt but what they were, and I don't know but what there were more. There were others in the conspiracy with them. But that does not prove, gentlemen of the jury, that these parties were in that conspiracy; not at all."

This shows that there was no issue of fact on the trial as to the existence of what was constantly referred to during the trial as "the" conspiracy. The issue was as to the connection of the defendants on trial with that conspiracy; and, as to this issue, the rights of the defendants were not affected, under the instructions of the court, by the Dunbar letters.

The jury having returned for further instructions, and having, after such instructions were given, asked the court what the punishment was, provided for the crime charged, the court inquired of defendants' attorney Mr. Fulton if there was any objection to an answer to the question asked. Mr. Fulton said there was no objection. The court then stated to the jury the substance of the provision of the statute on that subject. Thereupon the attorney for the United States stated that it was within the power of the court to imprison the defendants for one day, and impose a fine of one dollar. In response to this statement by the attorney for the United States the court said, addressing the jury:

"You are not to infer from the statement made by the attorney for the United States that if the defendants are found guilty the court will only impose a nominal punishment upon them."

The object of this remark by the court was to prevent the jury from acting upon the suggestion or belief that a verdict of guilty would only result in a nominal or light punishment. It cannot be presumed, in the face of this statement by the court, that the jury would be influenced by the remark of the attorney for the United States to return a verdict against the defendants, under the belief that the court would impose only a slight punishment. The statement of the court to the jury had a contrary tendency,—a tendency to warn them that the punishment would not be as suggested by the attorney for the United States, since it warned them against any inference of that character. The motion for a new trial is denied.